IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AHSHA PICKARD, | No. 2:16-CV-1545-JAM-CMK |
| Plaintiff, | |
| vs. | FINDINGS AND RECOMMENDATIONS |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

Plaintiff, who is proceeding with retained counsel, brings this action under 42 U.S.C. § 405(g) for judicial review of a final decision of the Commissioner of Social Security. Pending before the court are plaintiff's motion for summary judgment (Doc. 17) and defendant's cross-motion for summary judgment (Doc. 22).

/ / /

/ / /

/ / /

/ / /

/ / /

## I. PROCEDURAL HISTORY

Plaintiff applied for social security benefits on December 9, 2012. In the application, plaintiff claims that disability began on December 31, 2011. Plaintiff's claim was initially denied. Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on October 24, 2014, before Administrative Law Judge ("ALJ") Lawrence J. Duran. In a November 25, 2014, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

1. The claimant has the following severe impairment(s): post-traumatic stress disorder (PTSD); panic disorder with agoraphobia; and bipolar disorder;

2. The claimant does not have an impairment or combination of impairments that meets or medically equals an impairment listed in the regulations;

3. The claimant has the following residual functional capacity: she can perform the full range of work at all exertional levels with the following non-exertional limitations: occasional interaction with co-workers and public; no intense concentration for more than 1 hour without a 5 minute change in focus; no fast pace work; would be absent or off task 5% of the time, which would be one day a month absent and off task 5%; and

4. Considering the claimant's age, education, work experience, residual functional capacity, and vocational expert testimony, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

After the Appeals Council declined review on March 22, 2016, this appeal followed.

## II. STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole. See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999). "Substantial evidence" is more than a mere scintilla, but less than a preponderance. See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971). The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must

be considered and weighed. See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence. See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive. See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987). Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

### III. DISCUSSION

In her motion for summary judgment, plaintiff argues that the ALJ's residual functional capacity assessment is flawed because: (1) the ALJ improperly rejected her statements as not credible; and (2) the ALJ improperly rejected the opinions of Drs. Skelton and Munn. Plaintiff also argues that, given these errors in determining plaintiff's residual functional capacity; hypothetical questions posed to the vocational expert failed to provide substantial evidence to support the ALJ's vocational finding.

  A. **Plaintiff's Credibility**

The Commissioner determines whether a disability applicant is credible, and the court defers to the Commissioner's discretion if the Commissioner used the proper process and provided proper reasons. See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996). An explicit credibility finding must be supported by specific, cogent reasons. See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990). General findings are insufficient. See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995). Rather, the Commissioner must identify what testimony is not credible

and what evidence undermines the testimony. See id. Moreover, unless there is affirmative evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not credible must be "clear and convincing." See id.; see also Carmickle v. Commissioner, 533 F.3d 1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007), and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

If there is objective medical evidence of an underlying impairment, the Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence. See Bunnell v. Sullivan, 947 F.2d 341, 347-48 (9th Cir. 1991) (en banc). As the Ninth Circuit explained in Smolen v. Chater:

> The claimant need not produce objective medical evidence of the [symptom] itself, or the severity thereof. Nor must the claimant produce objective medical evidence of the causal relationship between the medically determinable impairment and the symptom. By requiring that the medical impairment "could reasonably be expected to produce" pain or another symptom, the Cotton test requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon.

80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).

The Commissioner may, however, consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions. See Bunnell, 947 F.2d at 345-47. In weighing credibility, the Commissioner may also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and third-party testimony about the nature, severity, and effect of symptoms. See Smolen, 80 F.3d at 1284 (citations omitted). It is also appropriate to consider whether the claimant cooperated during physical examinations or provided conflicting statements concerning drug and/or alcohol use. See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002). If the claimant testifies as to symptoms greater than would normally be produced by a given

1    impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See

2    Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

3              Regarding reliance on a claimant's daily activities to find testimony of disabling

pain not credible, the Social Security Act does not require that disability claimants be utterly

incapacitated.  See Fair v. Bowen, 885 F.2d 597, 602 (9th Cir. 1989).  The Ninth Circuit has

repeatedly held that the  ". . . mere fact that a plaintiff has carried out certain daily activities . . .

does not . . .[necessarily] detract from her credibility as to her overall disability."  See Orn v.

Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (quoting Vertigan v. Heller, 260 F.3d 1044, 1050 (9th

Cir. 2001)); see also Howard v. Heckler, 782 F.2d 1484, 1488 (9th Cir. 1986) (observing that a

claim of pain-induced disability is not necessarily gainsaid by a capacity to engage in periodic

restricted travel); Gallant v. Heckler, 753 F.2d 1450, 1453 (9th Cir. 1984) (concluding that the

claimant was entitled to benefits based on constant leg and back pain despite the claimant's

ability to cook meals and wash dishes); Fair, 885 F.2d at 603 (observing that "many home

activities are not easily transferable to what may be the more grueling environment of the

workplace, where it might be impossible to periodically rest or take medication").  Daily

activities must be such that they show that the claimant is ". . .able to spend a substantial part of

his day engaged in pursuits involving the performance of physical functions that are transferable

to a work setting."  Fair, 885 F.2d at 603.  The ALJ must make specific findings in this regard

before relying on daily activities to find a claimant's pain testimony not credible.  See Burch v.

Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).

              In her motion for summary judgment, plaintiff alleges that her disability is due

entirely to mental impairments which became disabling after the death of her dog in December

2011. In a March 14, 2013, Function Report – Adult, plaintiff stated:

> I have had several traumatic events in my life that have caused me distress.  In 2009, when my son was molested at a babysitter's home when I went to work, I became very nervous about leaving my son to work.

///

5

> Then in December 2011, my dog was brutally killed and mutilated in front of me, which has caused me to suffer such extreme mental anguish that has proved debilitating, and reoccures [sic] in my mind daily in the form of flashbacks and nightmares. I now live with a panic disorder and stress dissorder [sic] brought about from trauma.

See CAR 197-205.[1]

Plaintiff stated that her frequent panic attacks prevent her from completing tasks. See id. Plaintiff also stated that her panic attacks cause her to feel ill when faced with dealing with a challenge. See id. Plaintiff alleges that her thoughts at night are consumed with tragic and disturbing re-enactment. See id. She stated that, while she prepares meals her herself and her son daily, they are not as elaborate as before her onset date, and she only spends about half an hour on meal preparation. See id. Plaintiff stated that she has become socially nervous and does not spend much time socializing. See id. According to plaintiff, she socializes minimally and only about once a month. See id. She also reported that she does not volunteer for activities at her son's school because she gets panicked. See id.

In a June 6, 2013, Disability Report – Appeal, plaintiff stated:

> I often have nightmares and sometimes I scream and my son wakes me up. Sometimes I cannot even go to bed because I do not want to have the nightmares. I can function around my house. Sometimes I do have a panic attack at home and I get so whoozy [sic] that I drop things and break them. Dealing with deadlines causes me to panic, driving causes panic, going to the grocery store causes anxiety attacks when having contact with the clerk. I can watch TV and read. I do not have any one over and I do not go out. I do not allow my son to go to other's homes. He is 8 now. When I go to his school I have a hard time with anxiety attacks so I cannot volunteer the way I wish I could. Sometimes I can interact with the teacher or the other moms and sometimes I need to just get him and go.

See CAR 251.

In a September 19, 2013, Disability Report – Appeal, plaintiff stated:

> I still have social anxiety. I get overwhelmed easily by various tasks outside the home. I get overwhelmed trying to decide things regarding any big task that I must face. Sometimes my family helps me

---

[1] Citations are to the Certified Administrative Record lodged on November 30, 2016 (Doc. 13).

6

|   |   |
|---|---|
| 1 | with my son. I have him enrolled in school but he is not going because of an incident that happened at the school. I am unable to decide whether to take him back or to homeschool him. He is in 3rd grade. Sometimes I don't feel well from flashbacks of trauma. I need to lay down and calm myself. I am still having nightmares 2-3 times a week and flashbacks on a daily basis. After the nightmares I feel really bad in the morning. |


1    with my son. I have him enrolled in school but he is not going because of
2    an incident that happened at the school. I am unable to decide whether to
     take him back or to homeschool him. He is in 3rd grade. Sometimes I
3    don't feel well from flashbacks of trauma. I need to lay down and calm
     myself. I am still having nightmares 2-3 times a week and flashbacks on a
4    daily basis. After the nightmares I feel really bad in the morning.

See CAR 259.

Regarding plaintiff's testimony and credibility, the ALJ began by noting the following history:

> The claimant is a 37-year old woman with a college education. She alleged disability due to post-traumatic stress disorder (PTSD). The record reflects that the claimant witnessed a traumatic event involving the death of her dog. The claimant's son was also abused by a babysitter's daughter. The record reflects a history of panic attacks (Exhibit 13F3). . . .

In finding that plaintiff's statements are not entirely credible, the ALJ stated:

> The claimant has described activities of daily living, which are not as limited as one would expect considering the complaints of disabling symptoms. For example, the claimant makes breakfast for herself and her son (Exhibit 3E3). She gets her son ready for school (Exhibit 3E3). The claimant has no problem with personal care tasks (Exhibit 3E4) The claimant prepares meals (Exhibit 3E5). The claimant sweeps, vacuums, does laundry, and does dishes (Exhibit 3E4). The claimant drives a car (Exhibit 3E5). I note that driving inherently involves constant and complex coordination. She can manage her own finances (Exhibit 3E5). The claimant watches television, watches movies, reads, and writes (Exhibit 3E6). She watches science programs with her son. The claimant listens to music and goes outside. The claimant is apparently able to care for young children at home, which can be quite demanding both physically and emotionally, without any particular assistance.

The ALJ concluded by stating that plaintiff's ". . .demeanor while testifying at the hearing was generally unpersuasive."

At the outset, the court finds that the ALJ's observation of plaintiff's "demeanor while testifying" does not constitute substantial evidence supporting the credibility analysis. See Rashad, 903 F.2d at 1231; Lester, 81 F.3d at 834. Specifically, the ALJ has not identified which testimony is not credible based on plaintiff's demeanor, nor has the ALJ described the particular demeanor found to have undermined plaintiff's credibility.

As to the ALJ's reliance on activities of daily living, the court agrees with plaintiff that the ALJ erred because the activities described are not inconsistent with plaintiff's claimed limitations and are not necessarily transferrable to a work setting. See Fair, 885 F.2d at 602; Orn, 495 F.3d at 639; see also Reddick v. Chater, 157 F.3d 715 (9th Cir. 1998). Notably, while plaintiff can do the things described by the ALJ – like make breakfast, ger her son ready for school, and light housework – many of the limitations plaintiff describes with respect to these activities are consistent with agoraphobia, which the ALJ assessed as severe. It appears based on plaintiff's testimony and statements that, as long as she does not need to go outside her home for an extended period, she can function. For example, plaintiff reported that she does not volunteer for activities at her son's school because she gets panicked. Due to severe agoraphobia, plaintiff's daily activities – which consist mainly of things she can do in the home – are not necessarily transferrable to a work setting. Given the ALJ's own finding that plaintiff suffers from severe agoraphobia, it is unclear why the ALJ did not account for this impairment when discussing plaintiff's daily activities in the context of his credibility assessment.

The matter should be remanded for further consideration of the credibility of plaintiff's statements and testimony, particularly in light of the ALJ's finding that plaintiff suffers severe agoraphobia which provides a possible explanation as to why plaintiff can perform daily activities in the home but not outside the home.

**B.    Evaluation of Medical Opinions**

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional. See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987). The least weight is given to the opinion of a non-examining professional. See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4

(9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether: (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record. See Lester, 81 F.3d at 831. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict. See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995). A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence. See Lester, 81 F.3d at 830. This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a finding. See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989). Absent specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or examining professional. See Lester, 81 F.3d at 830-31. The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional. See id. at 831. In any event, the Commissioner need not give weight to any conclusory opinion supported by minimal clinical findings. See Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see also Magallanes, 881 F.2d at 751.

/ / /

/ / /

/ / /

/ / /

/ / /

In this case, the ALJ relied on the opinions of agency non-examining consulting sources, specifically Drs. Joshua D. Schwartz, Ph.D. (see CAR at Exhibit 1A9), Yanira Olaya, M.D. (see CAR at Exhibit 3A7), and C. David, M.D. (see CAR at Exhibit 3A8). As to these opinions, the ALJ stated:

> State agency psychological consultant, Joshua D. Schwartz, Ph.D., completed a medical source statement on May 15, 2013 (Exhibit 1A6). Dr. Schwartz commented that the claimant was capable of simple tasks and limited public contact (Exhibit 1A6). Dr. Schwartz indicated that the claimant was moderately limited in the following areas: carrying out detailed instructions; maintaining concentration for extended periods; performing activities within a schedule; maintaining regular attendance and being punctual within customary tolerances; completing a normal work day and work week without interruption from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; and responding appropriately to changes in the work setting (Exhibit 1A9). On August 22, 2013, state agency psychological consultant, Yanira Olaya, M.D., commented that the claimant could do unskilled tasks in a limited public setting (Exhibit 3A7). These assessments are given substantial weight. They were based on a thorough review of the file. These limitations regarding public contact are consistent with the claimant's anxiety symptoms in the record. The finding that the claimant would be able to do unskilled tasks is given partial weight. The undersigned finds that the claimant could not do jobs with intense concentration for more than an hour. This is consistent with the claimant's anxiety symptoms and her ability to concentrate long enough to watch television. . . .
>
> State agency medical consultant, C. David, M.D., commented that the claimant did not have a severe physical impairment on September 10, 2013 (Exhibit 3A8). This assessment is given great weight. It is consistent with the record. On December 5, 2013, the claimant had normal muscle tone (Exhibit 13F15). Dr. David has conducted a thorough review of the file. There is minimal evidence of physical complaints or symptoms.

1. Dr. Skelton

As to Dr. Skelton, the ALJ stated:

Dr. Skelton Ph.D., completed a medical source statement on April 30, 2013 (Exhibit 5F6). Dr. Skelton commented that the claimant was distracted and had impaired memory depending on how the day [sic]. Dr. Skelton stated that the claimant's behavior was depressed. The claimant has fair ability to understand, remember and carry out complex as well as simple instructions. The claimant had poor ability to maintain concentration, attention, and persistence. The claimant had fair ability to

|   |   |
|---|---|
| 1 | perform activities within a schedule and maintain regular attendance. She had poor ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. The claimant had poor ability to respond appropriately to changes in a work setting (Exhibit 5F6). Dr. Skelton assigned the claimant with a Global Assessment of Functioning (GAF) score of 50 on August 3 [2012], August 18, 2012, October 20, 2012, and November 6, 2012 (Exhibits 5F7, 5F8, 5F9). The GAF scale indicates the clinician's judgment of the individual's overall level of functioning. It is measured on a scale of 1 to 100 with one being persistent danger of hurting self or others and 100 being no symptoms. A score between 41 and 50 can indicate serious impairment in social, occupational, or school functioning. . . . |

Citing Exhibit 5F11, the ALJ noted that Dr. Skelton had also assigned plaintiff a GAF score of 33 and continued as follows:

> . . .A score between 31 and 40 can indicate major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. The undersigned gives little weight to these GAF scores because they do not accurately reflect the claimant's overall level of functioning or daily activities. The undersigned also notes that even if the GAF scores given accurately reflected the claimant's GAF at the time, the GAF scale does not have a direct correlation to the severity requirements of the Social Security Administration's mental disorders listings. . . .
>
> Furthermore, it is not clear that the doctor was familiar with the Social Security Administration's disability programs and their evidentiary requirements. . . .
>
> Dr. Skelton described circumstances related to the death of the claimant's pet dog (Exhibit 5F11). Dr. Skelton stated that the claimant's daily functioning was significantly compromised. The claimant had a difficult time remembering what needed to be done each day and would forget the simplest of functions (Exhibit 5F12). On December 31, 2011, Dr. Skelton completed a form indicating that the claimant had moderately severe to severe limitations in the following: understanding and memory; sustained concentration and persistence; adaptation and social interaction (Exhibit 2F5). Dr. Skelton's opinions are given little weight. Dr. Skelton has a short treating relationship with the claimant. He saw the claimant from August 2012 to April 2013. The undersigned gives reduced weight to these findings as they were not the result of an in-person examination and are contained in a form consisting largely of checked boxes without further explanation. These findings are inconsistent and contrast sharply with the other evidence of record, rendering them less persuasive. These differences may be the possible result of sympathy for the patient.

///

///

11

The court finds that the lack of an in-person examination and limited treating relationship are not legitimate reasons for rejecting Dr. Skelton's opinions given the ALJ's reliance on the opinions of state agency sources who did not even examine the plaintiff or have any treating history. The court also rejects the ALJ's reliance on "other evidence of record" where the ALJ does not specify which "other evidence" in particular is inconsistent with any specific opinion rendered by Dr. Skelton. See Magallanes, 881 F.2d at 751-55. The ALJ also rejected Dr. Skelton's opinion because it was set forth on a check-the-box form without "further explanation." The ALJ, however, fails to acknowledge a letter attached to Dr. Skelton's medical source statement in which he explains his findings. See CAR 303.

The matter should be remanded for further consideration of Dr. Skelton's opinions.

2. Dr. Munn

As to Dr. Munn, the ALJ stated:

> William C. Munn II, M.D., wrote letters on behalf of the claimant on December 12, 2012, and October 19, 2014 (Exhibits 4F8, 14F). In both letters, Dr. Munn diagnosed the claimant with post-traumatic stress disorder. Dr. Munn assigned the claimant with a Global Assessment of Functioning (GAF) score of 44. . . . Dr. Munn commented that the claimant's thought processes were not goal oriented and not goal reached. She had difficulty making decisions. Dr. Munn commented that the claimant was frequently in highly anxious states and then proceeded to a panic state. The claimant was often in anxious states and could dissolve into tears for hours. Dr. Munn's prognosis was guarded (Exhibit 14F1). On December 12, 2012, Dr. Munn stated that he had never seen a civilian as injured and incapacitated as the claimant. Dr. Munn stated that the claimant had been non functional since witnessing the death of her dog in 2011 (Exhibit 4F9). As an opinion on an issue reserved to the Commissioner, this statement is not entitled to controlling weight and is not given special significance pursuant to 20 CFR 416.927(e); SSR 96-5. In addition, this opinion is not supported by objective evidence, is inconsistent with the record as a whole, and demonstrates a lack of understanding of social security disability programs and evidentiary requirements. This assessment is given little weight. It is inconsistent with the claimant's considerable activities of daily living. . . .

///

///

The ALJ then noted the following examples of plaintiff's activities:

> . . .The claimant makes breakfast for herself and her son (Exhibit 3E3). She gets her son ready for school (Exhibit 3E3). The claimant has no problem with personal care tasks (Exhibit 3E4) The claimant prepares meals (Exhibit 3E5). The claimant admits she can sweep, vacuum, do laundry, and do dishes (Exhibit 3E4). The claimant drives a car (Exhibit 3E5). She can manage her own finances (Exhibit 3E5). The claimant watches television, watches movies, reads, and writes (Exhibit 3E6)

Regarding Dr. Munn, the ALJ continued as follows:

> Dr. Munn completed a medical source statement on January 1, 2012, March 30, 2013, and October 19, 2014 (Exhibits 4F6, 14F3). On October 19, 2014, Dr. Munn commented that the claimant was severely limited in the ability to remember locations and work like procedures; the ability to understand and remember very short and simple instructions; and the ability to understand and remember detailed instructions. The claimant was severely limited in the ability to carry out short and simple instructions. The claimant was severely limited in the area of sustained concentration and persistence. The claimant was severely limited in the area of social interaction and adaptation (Exhibit 14F). On January 1, 2012, and March 30, 2013, Dr. Munn indicated that the claimant was moderately to severely limited in understanding and memory; sustained concentration and persistence; and adaptation. The claimant had mild to moderately severe limitations on social interaction (Exhibits 3F11, 4F5). In all assessments, Dr. Munn indicated that the claimant had a substantial loss of ability to understand, remember, and carry out simple instructions, and the ability to maintain judgements that are commensurate with functions of unskilled work. Dr. Munn indicated that the claimant had a substantial loss of ability to respond appropriately to supervision, coworkers, and usual work situations. The claimant had a substantial loss of ability to deal with changes in a routine work setting (Exhibits 4F6, 14F6). The date of onset of these limitations was January 1, 2012 (Exhibit 14F6). These assessments are given little weight. They consist largely of checked boxes without further explanation. The severity of these findings is not supported by the medical records and they are not consistent with other substantial evidence in the record. These drastic differences may have been the possible result of sympathy for the patient or an effort to avoid unnecessary tension with the patient after a demand for supporting material has been made.

The court finds that the ALJ erred in rejecting Dr. Munn's December 12, 2012, and October 19, 2014, letters based on plaintiff's daily activities. As discussed above, and in light of plaintiff's severe agoraphobia, plaintiff's daily activities are not necessarily inconsistent with her own statements nor Dr. Munn's assessed limitations.

13

The court also finds that the ALJ erred with respect to Dr. Munn's January 1, 2012, March 30, 2013, and October 19, 2014, medical source statements. First, the ALJ appears to have ignored the December 12, 2012, and October 19, 2014, letters as explanation of these statements. Second, the ALJ has not identified which evidence in particular is inconsistent with a specific opinion rendered by Dr. Munn. See Magallanes, 881 F.2d at 751-55. Finally, the ALJ's statement that Dr. Munn's opinions ". . .may have been the possible result of sympathy for the patient or an effort to avoid unnecessary tension with the patient after a demand for supporting material has been made" is entirely speculative and not based on any evidence of record.

### C. Vocational Finding

The ALJ may meet his burden under step five of the sequential analysis by propounding to a vocational expert hypothetical questions based on medical assumptions, supported by substantial evidence, that reflect all the plaintiff's limitations. See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995). Specifically, where the Medical-Vocational Guidelines are inapplicable because the plaintiff has sufficient non-exertional limitations, the ALJ is required to obtain vocational expert testimony. See Burkhart v. Bowen, 587 F.2d 1335, 1341 (9th Cir. 1988).

Hypothetical questions posed to a vocational expert must set out all the substantial, supported limitations and restrictions of the particular claimant. See Magallanes v. Bowen, 881 F.2d 747, 756 (9th Cir. 1989). If a hypothetical does not reflect all the claimant's limitations, the expert's testimony as to jobs in the national economy the claimant can perform has no evidentiary value. See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991). While the ALJ may pose to the expert a range of hypothetical questions based on alternate interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's determination must be supported by substantial evidence in the record as a whole. See Embrey v. Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).

Given the errors identified above with respect to evaluation of plaintiff's credibility and the opinions of Drs. Skelton and Munn, the court cannot say that the ALJ relied on the vocational expert's answers to hypothetical questions which accurately described plaintiff's residual functional capacity. The matter should be remanded for a new vocational findings following reassessment of plaintiff's credibility and the opinions of Drs. Skelton and Munn.

## IV. CONCLUSION

Based on the foregoing, this matter should be remanded under sentence four of 42 U.S.C. § 405(g) for further development of the record and/or further findings addressing the deficiencies noted above. Accordingly, the undersigned recommends that:

1. Plaintiff's motion for summary judgment (Doc. 17) be granted;
2. Defendant's cross motion for summary judgment (Doc. 22) be denied; and
3. This matter be remanded for further proceedings.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days after being served with these findings and recommendations, any party may file written objections with the court. Responses to objections shall be filed within 14 days after service of objections. Failure to file objections within the specified time may waive the right to appeal. See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: March 8, 2018

CRAIG M. KELLISON
UNITED STATES MAGISTRATE JUDGE